O’MALLEY, Circuit Judge,
concurring.
I agree with the majority’s well-reasoned conclusion that the International Trade Commission (“the Commission”) lacks jurisdiction over this case. The majority’s analysis under the Chevron framework correctly reveals that the Commission’s interpretation of 19 U.S.C. § 1337 (“Section 337”) is not entitled to deference. I write separately, however, because I believe we need not resort to Chevron steps, one and two to resolve this matter.
.Deference to an agency interpretation under the Chevron framework “is premised on the theory that a statute’s ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.” King v. Burwell, — U.S. -, 135 S.Ct. 2480, 2488, 192 L.Ed.2d 483 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). There are “extraordinary cases,” however, where we should “hesitate before concluding that Congress has intended such an implicit delegation.” Id. at 2488-89 (quoting FDA, 529 U.S. at 159, 120 S.Ct. 1291). In other words, there are times when courts should not search for an ambiguity in the statute because it is clear Congress could not have intended to grant the agency authority to act in the substantive space at issue. This is one of those extraordinary cases. Where, as here, Congress has not delegated authority to an agency, courts need not apply the Chevron framework to the agency’s interpretation of its governing statute. See id. at 2489.
The Commission has concluded that it has jurisdiction over all incoming international Internet data transmissions. It reaches this conclusion despite never having purported to regulate Internet transmissions in the past, despite no reference to data transmissions in the statute under which it acts, despite an absence of expertise in dealing with such transmissions, and despite the many competing policy concerns implicated in any attempt to regulate Internet transmissions. The Internet is “arguably the most important innovation in communications in a generation.” Comcast Corp. v. FCC, 600 F.3d 642, 661 (D.C.Cir.2010). If Congress intended for the Commission to regulate one of the most important aspects of modern-day life, Congress surely would have said so expressly. Utility Air Regulatory Grp. v. EPA, — U.S. -, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) (rejecting EPA’s vast expansion of its program of requiring clean air permits because such an expansion “would bring about an enormous and transformative expansion in EPA’s regulatory authority without clear congressional authorization”). The Supreme Court has *1303 noted that “[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate ‘a significant portion of the American economy,’ we typically greet its announcement with a measure of skepticism.” Id. The Court further indicated that Congress must “speak clearly if it wishes to assign to an agency decisions of vast ‘economic and political significance.’ ” Id. (quoting FDA, 529 U.S at 160, 120 S.Ct. 1291). Here, far from clearly addressing the issue of whether the Commission should have jurisdiction over the international exchange of data on the Internet, Congress’s last major amendment to Section 337 was made well before the Internet became a regular vehicle for commercial transactions.
Although the Commission’s jurisdiction over imported physical goods is undeniable, it is very unlikely that Congress would have delegated the regulation of the Internet to the Commission, which has no expertise in developing nuanced rules to ensure the Internet remains an open platform for all. See King, 135 S.Ct. at 2489. Instead, the responsibility lies with Congress to decide how best to address these new developments in technology. See Microsoft v. AT & T Corp., 550 U.S. 437, 458-59, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (“If the patent law is to be adjusted better to account for the realities of software distribution, the alteration should be made after focused legislative consideration.”) (quotation omitted); see also Gottschalk v. Benson, 409 U.S. 63, 73, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (“If [computer] programs are to be patentable, considerable problems are raised which only committees of Congress can manage, for broad powers of investigation are needed, including hearings which canvass the wide variety of views which those operating in this field entertain.”).
Indeed, Congress has enacted laws and debated bills whose intent is to balance an interest in open access to the Internet and the need to regulate potential abusers. See, e.g., Communications Decency Act of 1996, 47 U.S.C. § 230(b)(1), (c)(1) (2012) (statute enacting immunity from liability for Internet service providers in order to “promote the continued development of the Internet and other interactive computer services and other interactive media”); 17 U.S.C. § 512 (statute limiting copyright infringement liability based on a similar policy); The Digital Trade Act of 2013, S.1788, 113th Cong. (2013-2014) (bill seeking to have agencies “staffed with experts and leaders to fulfill the mission of promoting an open, global Internet that facilitates commerce and digital trade”); Online Protection and Enforcement of Digital Trade Act, S.2029/H.R. 3782 (112th Cong.2011-2013) (bill proposing amendment of the Tariff Act to formally confer the ITC with jurisdiction over digital importation). Not once in these debates has Congress said or implied that it need not concern itself with these issues because it had already delegated the authority to do so to the Commission. Because Congress did not intend to delegate such authority to the Commission, I would find the two step Chevron inquiry inapplicable in this case; I would find that we never get past what some refer to as Chevron step zero when assessing the propriety of the Exclusion Order before us.[1]
*1304 Assuming, arguendo^ that the Chevron framework does apply to the Commission’s interpretation, however, I agree with the majority’s ruling that the Commission erred when it determined that it had jurisdiction over the disputed digital data.

. Chevron “step zero” has been defined as "the initial inquiry into whether the Chevron framework applies at all.” See Cass R. Sunstein, Chevron Step Zero, 92 Va. L.Rev. 187, 191 (2006). Some scholars believe this additional inquiry aids and streamlines review of administrative decision making. See, e.g., Thomas W. Merrill, Symposium, Chevron at 30: Looking Back and Looking Forward: Step Zero After City of Arlington, 83 Fordham L.Rev. 731, 744 (2014) (opining that the announcement of the Chevron step zero inquiry in Unit *1304 ed States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) was a "positive” step forward in administrative law, and critiquing more recent developments in Chevron step zero jurisprudence).