# United States Court of Appeals for the Federal Circuit

_____

**TIANRUI GROUP COMPANY LIMITED AND TIANRUI GROUP FOUNDRY COMPANY LIMITED,**

*Appellants,*

**and**

**STANDARD CAR TRUCK COMPANY, INC. AND BARBER TIANRUI RAILWAY SUPPLY, LLC,**

*Appellants,*

**v.**

**INTERNATIONAL TRADE COMMISSION,**

*Appellee,*

**and**

**AMSTED INDUSTRIES INCORPORATED,**

*Intervenor.*

_____

2010-1395

_____

On appeal from the United States International Trade Commission in Investigation No. 337-TA-655.

_____

Decided: October 11, 2011

_____

TOM M. SCHAUMBERG, Adduci, Mastriani & Schaumber, LLP, of Washington, DC, argued for all appellants. With him on the brief for TianRui Group Company Limited, et al., was JONATHAN J. ENGLER.  Also on the brief, were JOEL M. FREED, McDermott Will & Emery, LLP, of Washington, DC; and RUIXUE RAN, Jun He Law Offices, of Beijing, P.R. China.  Of counsel were STEVEN H. HOEFT, McDermott, Will & Emery, LLP, of Washington.

ANDREA C. CASSON, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission, of Washington, DC, for Appellee. With him on the brief were JAMES M. LYONS, General Counsel, and CLINT A. GERDINE, Attorney.

DEAN A. PELLETIER, McAndrews, Held & Malloy, Ltd., of Chicago, Illionis, for intervenor.  With him on the brief were GREGORY J. VOGLER, WILHELM L. RAO, YUFENG MA, and MICHAEL J. KRAUTNER.  Of counsel on the brief were LYLE B. VANDER SCHAAF and JAY H. REIZISS, Brinks Hofer Gilson & Lione, of Washington, DC.

---

Before BRYSON, SCHALL, and MOORE, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* BRYSON.
Dissenting opinion filed by *Circuit Judge* MOORE.

BRYSON, *Circuit Judge*

This appeal arises from a determination by the International Trade Commission that the importation of certain cast steel railway wheels violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.  The Commission found that the wheels were manufactured using a process that was developed in the United States, protected under domestic trade secret law, and misappropriated abroad.

We are asked to decide whether the Commission's statutory authority over "[u]nfair methods of competition and unfair acts in the importation of articles . . . into the United States," as provided by section 337(a)(1)(A), allows the Commission to look to conduct occurring in China in the course of a trade secret misappropriation investigation. We conclude that the Commission has authority to investigate and grant relief based in part on extraterritorial conduct insofar as it is necessary to protect domestic industries from injuries arising out of unfair competition in the domestic marketplace.

We are also asked to decide whether the Commission erred by finding that the imported wheels would injure a domestic industry when no domestic manufacturer is currently practicing the protected process. In light of the evidence before the Commission regarding the marketplace for cast steel railway wheels, we affirm the Commission's determination that the wheel imports threaten to destroy or substantially injure an industry in the United States, in violation of section 337.

I

A

Amsted Industries Inc. is a domestic manufacturer of cast steel railway wheels. It owns two secret processes for manufacturing such wheels, the "ABC process" and the "Griffin process." Amsted previously practiced the ABC process at its foundry in Calera, Alabama, but it no longer uses that process in the United States. Instead, Amsted uses the Griffin process at three of its domestic foundries. Amsted has licensed the ABC process to several firms with foundries in China.

TianRui Group Company Limited and TianRui Group Foundry Company Limited (collectively, "TianRui") manufacture cast steel railway wheels in China. In 2005, TianRui sought to license Amsted's wheel manufacturing technology, but the parties could not agree on the terms of a license. After the failed negotiations, TianRui hired nine employees away from one of Amsted's Chinese licensees, Datong ABC Castings Company Limited. Some of those employees had been trained in the ABC process at the Calera plant in Alabama, and others had received training in that process at the Datong foundry in China.

Datong had previously notified those employees through a written employee code of conduct that information pertaining to the ABC process was proprietary and confidential. Each employee had been advised that he had a duty not to disclose confidential information. Eight of the nine employees had also signed confidentiality agreements before leaving Datong to begin working for TianRui. In the proceedings brought by Amsted before the International Trade Commission, Amsted alleged that the former Datong employees disclosed information and documents to TianRui that revealed the details of the ABC process and thereby misappropriated Amsted's trade secrets.

TianRui partnered with Standard Car Truck Company, Inc., ("SCT") to form the joint venture Barber TianRui Railway Supply, LLC. SCT and Barber have marketed TianRui wheels to United States customers and have imported TianRui wheels into the United States. Other than Amsted, SCT and Barber are the only companies selling or attempting to sell cast steel railway wheels in the United States.

B

Amsted filed a complaint with the Commission alleging a violation of section 337 based on TianRui's misappropriation of trade secrets. Section 337(a)(1)(A) prohibits "[u]nfair methods of competition and unfair acts in the importation of articles . . . into the United States, . . . the threat or effect of which is . . . to destroy or substantially injure an industry in the United States."

TianRui moved to terminate the proceedings on the ground that the alleged misappropriation occurred in China and that Congress did not intend for section 337 to be applied extraterritorially. An administrative law judge at the Commission denied that motion based on his view that section 337 focuses not on where the misappropriation occurs but rather on the nexus between the imported articles and the unfair methods of competition. The administrative law judge also rejected TianRui's argument that Chinese courts would provide a better forum for Amsted's complaint.

At the merits stage, the administrative law judge analyzed the alleged misappropriation under Illinois trade secret law. After noting that the Commission has looked to general principles of tort or commercial law in past investigations involving trade secret misappropriation, the administrative law judge cited this court's statement in *Leggett & Platt, Inc. v. Hickory Springs Manufacturing Co.*, 285 F.3d 1353, 1360 (Fed. Cir. 2002), that "[t]rade secret misappropriation is a matter of state law," as the basis for applying state law to this section 337 investigation. He applied Illinois law because Amsted, SCT, and Barber all have their principal place of business in Illinois. He noted, however, that "the Illinois law relating to trade secrets does not differ substantially from the law

applied in previous Commission trade secret investigations," and he then applied general principles of trade secret law, including the six factors defining a trade secret set forth in the comments to section 757 of the Restatement (First) of Torts.

Following a 10-day evidentiary hearing, the administrative law judge found that TianRui had misappropriated 128 trade secrets relating to the ABC process from Datong. That conclusion was based on evidence that included an admission by TianRui's expert that TianRui's foundry used the asserted trade secrets; his only contention was that the trade secrets were not actually secret. In addition, the administrative law judge compared TianRui's manufacturing specifications with secret Datong documents outlining the ABC process and found them essentially identical. In fact, some of the TianRui specifications contained the same typographical errors that were found in the Datong documents. The administrative law judge also relied on similarities in foundry layout between the Datong and TianRui plants. The administrative law judge summarized the evidence as to the appropriation of the trade secrets by saying that "there is overwhelming direct and circumstantial evidence that TianRui obtained its manufacturing process for cast steel railway wheel[s] through the misappropriation of [Amsted's] ABC Trade Secrets."

Besides contesting the Commission's authority to apply section 337 extraterritorially, TianRui contended that Amsted did not satisfy the domestic industry requirement of section 337 based on the fact that Amsted no longer practiced the ABC process in the United States. Because none of Amsted's domestic operations used the ABC process, TianRui argued that there was no "domestic

industry" that could be injured by the misappropriation of trade secrets relating to that process.

The administrative law judge rejected that argument, holding that it was not essential that the domestic industry use the proprietary process, as long as the misappropriation of that process caused injury to the complainant's domestic industry. Applying that standard, the administrative law judge concluded that Amsted's domestic industry would be substantially injured by the importation of TianRui wheels.

The Commission decided not to review the administrative law judge's initial determination and issued a limited exclusion order. TianRui then appealed to this court.

II

The main issue in this case is whether section 337 authorizes the Commission to apply domestic trade secret law to conduct that occurs in part in a foreign country.

Section 337 authorizes the Commission to exclude articles from entry into the United States when it has found "[u]nfair methods of competition [or] unfair acts in the importation of [those] articles." 19 U.S.C. § 1337(a)(1)(A). The Commission has long interpreted section 337 to apply to trade secret misappropriation. *See, e.g.*, *Certain Nut Jewelry and Parts Thereof*, Inv. No. 337-TA-229, USITC Pub. 1929 (Nov. 1986); *Certain Processes for the Manufacture of Skinless Sausage Casings and Resulting Product*, Inv. No. 337-TA-148/169, USITC Pub. 1624 (Dec. 1984) ("*Sausage Casings*"); *Certain Apparatus for the Continuous Production of Copper Rod*, Inv. No. 337-TA-52, USITC Pub. 1017 (Nov. 1979). TianRui does not challenge that

interpretation. Nor does it dispute the Commission's factual finding that proprietary information belonging to Amsted was disclosed to TianRui in breach of obligations of confidentiality imposed on the former Datong employees or the finding that the information was used in manufacturing the imported railway wheels. Instead, TianRui focuses on the fact that the disclosure of the trade secret information occurred in China. According to TianRui, section 337 cannot apply to extraterritorial conduct and therefore does not reach trade secret misappropriation that occurs outside the United States.

Amsted argues that the Commission did not apply section 337 extraterritorially, because trade secrets were misappropriated in the United States as a legal matter when railway wheels made by exploiting those trade secrets were imported into the United States and sold to customers or disclosed to the Association of American Railroads for certification purposes. Amsted argues that Illinois law defines trade secret misappropriation very broadly and that under Illinois law any unauthorized "use" of an article embodying a trade secret constitutes misappropriation. That definition of misappropriation, according to Amsted, is broad enough to encompass any use of articles produced by the misappropriated process, not simply the acts that constitute a direct breach of the duty of confidentiality. Amsted concludes that the administrive law judge therefore had sufficient evidence to find trade secret misappropriation based on TianRui's importation of the wheels and its disclosure of those wheels for certification purposes.

Like Amsted, the Commission argues that it applied section 337 based on TianRui's conduct in the United States and did not apply the statute extraterritorially to conduct occurring in China. In the alternative, the Com-

mission contends that section 337 applies to imported articles produced with misappropriated trade secrets, even if the disclosure of the proprietary information occurred outside the United States.

## A

At the outset, we reject Amsted's argument that Illinois trade secret law governs the section 337 inquiry in this case. The question of what law applies in a section 337 proceeding involving trade secrets is a matter of first impression for this court. We hold that a single federal standard, rather than the law of a particular state, should determine what constitutes a misappropriation of trade secrets sufficient to establish an "unfair method of competition" under section 337.

The administrative law judge acknowledged that in previous section 337 proceedings involving trade secret misappropriation, the Commission has applied general principles of trade secret law, not the law of any particular state. The administrative judge, however, felt bound to apply state law because of a statement by this court that issues of trade secret misappropriation are ordinarily matters of state law. *See Leggett & Platt*, 285 F.3d at 1360. That statement is, of course, true as a general matter and was true of the trade secret issue in the *Leggett & Platt* case, which addressed state law trade secret claims that were before this court under supplemental jurisdiction. But where the question is whether particular conduct constitutes "unfair methods of competition" and "unfair acts" in importation, in violation of section 337, the issue is one of federal law and should be decided under a uniform federal standard, rather than by reference to a particular state's tort law.

The question under section 337 is not whether the policy choices of a particular state's legislature or those reflected in a particular state's common law rules should be vindicated, but whether goods imported from abroad should be excluded because of a violation of the congressional policy of protecting domestic industries from unfair competition, which is a distinctly federal concern as to which Congress has created a federal remedy. In light of the fact that section 337 deals with international commerce, a field of special federal concern, the case for applying a federal rule of decision is particularly strong. In fact, the nonstatutory unfair competition provision of section 337 falls comfortably into both of the categories that have been described as calling for the application of federal common law—instances in which "a federal rule of decision is 'necessary to protect uniquely federal interests,' . . . and those in which Congress has given the courts the power to develop substantive law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456-57 (1957) (federal law provides the substantive law to be applied in actions for violations of a collective bargaining agreement under section 301 of the Labor Management Relations Act of 1947); *see also FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934) (stating that under the Federal Trade Commission Act federal courts are to determine what methods of competition are unfair, while giving weight to the Commission's determination); *cf. Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047-48 (Fed. Cir. 2001) (strong interest in uniform rule regarding on-sale bar in patent cases justifies reliance on federal common law generally informed by the Uniform Commercial Code and the Restatement of Contracts).

Fortunately, trade secret law varies little from state to state and is generally governed by widely recognized

authorities such as the Restatement of Unfair Competi-
tion and the Uniform Trade Secrets Act. Moreover, the
federal criminal statute governing theft of trade secrets
bases its definition of trade secrets on the Uniform Trade
Secrets Act, so there is no indication of congressional
intent to depart from the general law in that regard. *See*
18 U.S.C. § 1839(3); H.R. Rep. No. 104-788, at 12 (1996),
*reprinted in* 1996 U.S.C.C.A.N. 4021, 4031. In any event,
there is no dispute in this case pertaining to the substan-
tive law of trade secrets. The administrative law judge's
findings establish that TianRui obtained access to Am-
sted's confidential information through former Datong
employees, who were subject to duties of confidentiality
imposed by the Datong code of employee conduct, and
that TianRui exploited that information in producing the
subject goods. TianRui does not take issue with those
findings, which are sufficient to establish the elements of
trade secret misappropriation under either Illinois law or
the generally understood law of trade secrets, as reflected
in the Restatement, the Uniform Trade Secrets Act, and
previous Commission decisions under section 337.
Therefore, the choice of law issue, although it could be
important in other cases, does not affect the outcome of
this case.

In this case, TianRui argues that section 337 is inap-
plicable because Amsted's confidential information was
disclosed in China. The legal issue for us to decide is thus
whether section 337 applies to imported goods produced
through the exploitation of trade secrets in which the act
of misappropriation occurs abroad.[1] To answer that

---

[1]    Amsted argues that the administrative law judge
found that Amsted's trade secrets were misappropriated
within the United States. The administrative law judge,
however, did not make such findings with respect to all of
Amsted's trade secrets. In fact, the administrative law

question, we must review the principles that apply to federal statutes that create causes of action based in part on conduct that occurs overseas.

B

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*"). That presumption expresses a canon of construction that is rooted in the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993). The canon "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord,"

---

judge made only one statement in the initial determination that hinted at domestic misappropriation. The administrative law judge implied that TianRui had submitted specifications containing trade secrets number 105, 237, and 239 to the Association of American Railroads for certification purposes. Because that finding relates to only three out of 128 trade secrets found to have been misappropriated, we do not affirm the exclusion order on that basis. Nor do we affirm the exclusion order on the ground that the evidence would have justified the administrative law judge in finding domestic misappropriation of all 128 trade secrets. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Finally, we reject Amsted's argument that TianRui's marketing and certification efforts in this country qualified as acts of "use" of Amsted's trade secrets (and thus constituted acts of misappropriation). That conduct may have exploited the earlier misappropriation, but it cannot reasonably be viewed as misappropriative conduct without regard to whether there has been a breach of a duty of confidentiality.

*Aramco*, 499 U.S. at 248, and "preserv[es] a stable background against which Congress can legislate with predictable effects." *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2881 (2010). The presumption is not an end in itself, but functions as a tool for ascertaining congressional intent.[2]

The presumption against extraterritoriality does not govern this case, for three reasons. First, section 337 is expressly directed at unfair methods of competition and unfair acts "in the importation of articles" into the United States. As such, "this is surely not a statute in which Congress had only 'domestic concerns in mind.'" *Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005) (holding that the wire fraud statute, 18 U.S.C. § 1343, applied to a scheme to smuggle liquor into Canada without paying excise taxes because the statute refers to "communication in interstate or foreign commerce"). The focus of section 337 is on an inherently international transaction—importation. In that respect, section 337 is analogous to immigration statutes that bar the admission of an alien who has engaged in particular conduct or who makes false statements in connection with his entry into this country. *See, e.g.*, 8 U.S.C. §§ 1101(f)(6), 1182(a). In such cases, the focus is not on punishing the conduct or the false statements, but on preventing the admission of the alien, so it is reasonable to assume that Congress was aware, and intended, that the statute would apply to conduct (or statements) that may have occurred abroad. *See United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005) ("Immigration statutes, by their very nature,

---

[2]    Even when the presumption against extraterritoriality applies, the Supreme Court has not treated the presumption as a "clear statement rule," but has noted that "context can be consulted as well." *Morrison*, 130 S. Ct. at 2883.

pertain to activity at or near international borders. It is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders."); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) (holding that a statute that "protects the borders of the United States against illegal immigration" would apply to extraterritorial acts by foreign nationals despite the lack of a clear statement of extraterritorial application because "'the natural inference from the character of the offense[s]' is that an extraterritorial location 'would be a probable place for [their] commission,'" quoting *United States v. Bowman*, 260 U.S. 94, 99 (1922)).

Second, in this case the Commission has not applied section 337 to sanction purely extraterritorial conduct; the foreign "unfair" activity at issue in this case is relevant only to the extent that it results in the importation of goods into this country causing domestic injury. In light of the statute's focus on the act of importation and the resulting domestic injury, the Commission's order does not purport to regulate purely foreign conduct. *See Morrison*, 130 S. Ct. at 2884 (focusing the extraterritoriality analysis on the "objects of the statute's solicitude"). Because foreign conduct is used only to establish an element of a claim alleging a domestic injury and seeking a wholly domestic remedy, the presumption against extraterritorial application does not apply. *See Small v. United States*, 544 U.S. 385, 388-89 (2005) (noting that the presumption against extraterritorial application does not apply to a prosecution for the domestic possession of a gun by someone convicted in a foreign court, although it would apply in considering whether the statute "prohibits unlawful gun possession abroad as well as domestically"); *id.* at 399 (Thomas, J., dissenting) (agreeing with the

majority that the presumption against extraterritorial application does not apply because "the Government is enforcing a domestic criminal statute to punish domestic criminal conduct").

The dissent disregards the domestic elements of the cause of action under section 337 and characterizes this case as involving "conduct which *entirely* occurs in a foreign country." That characterization accurately describes most of the events constituting the misappropriation, but the determination of misappropriation was merely a predicate to the charge that TianRui committed unfair acts in importing its wheels into the United States. In other words, the Commission's interpretation of section 337 does not, as the dissent contends, give it the authority to "police Chinese business practices."[3] It only sets the conditions under which products may be imported into the United States.

Under the dissent's construction of section 337, the importation of goods produced as a result of trade secret misappropriation would be immune from scrutiny if the act of misappropriation occurred overseas. That is, as

---

[3]  The dissent's concern about the possible extension of section 337 to other foreign business practices, such as the underpayment (or nonpayment) of employees, is unwarranted. At oral argument, the Commission explicitly disavowed any such authority. Moreover, in the analogous context of the Federal Trade Commission Act, the Supreme Court long ago responded to similar concerns by holding that the prohibition on "unfair methods of competition" does not encompass "practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." *FTC v. Gratz*, 253 U.S. 421, 427 (1920).

long as the misappropriating party was careful to ensure that the actual act of conveying the trade secret occurred outside the United States, the Commission would be powerless to provide a remedy even if the trade secret were used to produce products that were subsequently imported into the United States to the detriment of the trade secret owner. We think it highly unlikely that Congress, which clearly intended to create a remedy for the importation of goods resulting from unfair methods of competition, would have intended to create such a conspicuous loophole for misappropriators.[4]

---

[4] There is nothing remarkable about concluding that Congress would have wanted section 337 remedies to be available for acts of trade secret misappropriation occurring abroad. In a similar setting, Congress in 1996 enacted the Economic Espionage Act, 18 U.S.C. §§ 1831-39, to fill a gap in federal protection of trade secrets. That Act prohibits trade secret theft and applies to foreign conduct if "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837. Congress thus recognized that misappropriation of U.S. trade secrets can, and does, occur abroad, and that it is appropriate to remedy that overseas misappropriation when it has a domestic nexus.

Third, the legislative history of section 337 supports the Commission's interpretation of the statute as permitting the Commission to consider conduct that occurs abroad. Congress first enacted a prohibition against "unfair methods of competition" in the Federal Trade Commission Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914), codified as amended at 15 U.S.C. § 45. Congress chose that phrase because it was "broader and more flexible" than the traditional phrase "unfair competition," which had acquired a narrow meaning in its common law usages. *R.F. Keppel*, 291 U.S. at 310-12.

Congress intended a similarly broad and flexible meaning when it used the same language to prohibit "unfair methods of competition" in importation. That provision was added to the law in the Tariff Act of 1922, Pub. L. No. 67-318, § 316(a), 42 Stat. 858, 943, pursuant to a recommendation of the Tariff Commission (the former name of the International Trade Commission) in a 1919 report.[5] *See* U.S. Tariff Comm'n, *Dumping and Unfair Foreign Competition in the United States and Canada's Anti-dumping Law* (1919) ("1919 Report"). In its report, the Commission identified several deficiencies in U.S. trade laws, including the absence of any remedy for unfair competition other than dumping, *id.* at 11, and the lack of any adequate "governmental machinery" for investigating allegations of dumping, "one element of

---

[5]    The House Ways and Means Committee requested the 1919 Report in connection with its work on trade legislation. 1919 Report at 5, 7. It relied on the Commission's analysis in that report in explaining the antidumping provisions from Title II of the Emergency Tariff Act of 1921, Pub. L. No. 67-10, 42 Stat. 9, 11. *See* H.R. Rep. No. 66-479, at 2 (1919) (noting that investigatory authority extended to the original books of an overseas shipper or manufacturer); *see also* H.R. Rep. No. 67-1, at 23 (1921).

which must be found abroad," *id.* at 18. In a subsequent annual report, issued while the bill that was to become the 1922 Tariff Act was pending before Congress, the Commission renewed the recommendations from the 1919 report relating to unfair competition. *See* U.S. Tariff Comm'n, *Fifth Annual Report* 96 (1921).

In section 316 of the Tariff Act of 1922, Congress responded to the Commission's recommendation by declaring "unfair methods of competition and unfair acts in the importation of articles into the United States" to be unlawful. That Act authorized the Tariff Commission to investigate allegations of such conduct in accordance with rules that the Commission would promulgate, and it gave the President the authority to impose additional duties or to exclude articles that the Commission found to be in violation of that provision. The Senate report on the 1922 Act explained that "[t]he provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had." S. Rep. No. 67-595, pt. 1, at 3 (1922).

After the enactment of the Tariff Act of 1922, the Commission advised Congress that the new provisions "make it possible for the President to prevent unfair practices, even when engaged in by individuals residing outside the jurisdiction of the United States." U.S. Tariff Comm'n, *Sixth Annual Report* 4 (1922). When Congress subsequently enacted the Tariff Act of 1930, section 316 of the 1922 Act became section 337 of the new Act with some modifications to the provisions regarding remedies and judicial review. Congress did not, however, disagree with the Commission's characterization of the prohibition on

"unfair methods of competition" in the importation of articles into the United States, even though opponents criticized the Commission's broad authority to investigate acts of unfair competition with respect to goods imported into this country. *See Tariff Act of 1929, Vol. 17: Special and Administrative Provisions: Hearing on H.R. 2667 Before the S. Comm. on Finance*, 71st Cong. 77-79 (1929) (statement of James W. Bevans, representing the National Council of American Importers & Traders, Inc.). In light of the legislative background, and in particular in view of the close working relationship between the Commission and the relevant congressional committees,[6] it is fair to conclude that Congress contemplated that, in exercising its new authority over unfair competition, the Commission would consider conduct abroad in determining whether imports that were the products of, or otherwise related to, that conduct were unfairly competing in the domestic market.

---

[6] The House Ways and Means Committee, which was responsible for drafting the trade legislation, described its close collaboration with the Tariff Commission on the Tariff Act of 1922 in the following way: "[T]he staff of the Tariff Commission was placed at the disposal of the committee and has been called upon to work with the committee in drafting various tariff schedules. Through these efforts the bill herein recommended proposes many desirable changes in arrangement and classification." H.R. Rep. No. 67-248, at 2 (1921). Due to that close working relationship and the absence of anything in the legislative history contradicting the Commission's descriptions of section 316, we find the Commission's reports highly probative as to the meaning of that section. *Cf. Symbol Techs., Inc. v. Lemelson Med.*, 277 F.3d 1361, 1366 (Fed. Cir. 2002) (describing why the Federico commentary on the Patent Act of 1952 provided "an invaluable insight into the intentions of the drafters of the Act").

The Commission's interpretation of section 337 as reaching acts of trade secret misappropriation that occur abroad is consistent with the position it has taken regarding overseas acts of unfair competition since the enactment of section 337's predecessor. *See Sausage Casings*, USITC Pub. 1624, 243-298 (Initial Determination); Tariff Comm'n, *Sixth Annual Report* 4. We have held that the Commission's reasonable interpretations of section 337 are entitled to deference. *See Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (Fed. Cir. 1998); *Corning Glass Works v. U.S. Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986). Thus, even if we were to conclude that section 337 is ambiguous with respect to its application to trade secret misappropriation occurring abroad, we would uphold the Commission's interpretation of the scope of the statute. As it is, we conclude that the Commission's longstanding interpretation is consistent with the purpose and the legislative background of the statute, and we therefore hold that it was proper for the Commission to find a section 337 violation based in part on acts of trade secret misappropriation occurring overseas.

C

TianRui argues that the Commission should not be allowed to apply domestic trade secret law to conduct occurring in China because doing so would cause improper interference with Chinese law. We disagree. In the first place, as we have noted, the Commission's exercise of authority is limited to goods imported into this country, and thus the Commission has no authority to regulate conduct that is purely extraterritorial. The Commission does not purport to enforce principles of trade secret law in other countries generally, but only as that conduct affects the U.S. market. That is, the Com-

mission's investigations, findings, and remedies affect foreign conduct only insofar as that conduct relates to the importation of articles into the United States. The Commission's activities have not hindered TianRui's ability to sell its wheels in China or any other country.

Second, TianRui has failed to identify a conflict between the principles of misappropriation that the Commission applied and Chinese trade secret law. Indeed, in its forum non conveniens motion TianRui argued that Chinese trade secret law would provide a "more than adequate" remedy for any alleged misappropriation. In addition, China has acceded to the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C. We cannot discern any relevant difference between the misappropriation requirements of TRIPS article 39 and the principles of trade secret law applied by the administrative law judge in this case. We therefore detect no conflict between the Commission's actions and Chinese law that would counsel denying relief based on extraterritorial acts of trade secret misappropriation relating to the importation of goods affecting a domestic industry.

Finally, even apart from the acts of importation, the conduct at issue in this case is not the result of the imposition of legal duties created by American law on persons for whom there was no basis to impose such duties. The former Datong employees had a duty not to disclose Amsted's trade secrets arising from express provisions in the Datong employee code and, in the case of most of the employees, from confidentiality agreements that they

signed during their employment with Datong.[7]  Thus, the question in this case is whether the disclosure of protected information in breach of that duty is beyond the reach of section 337 simply because the breach itself took place outside the United States.  To answer that question in the affirmative would invite evasion of section 337 and significantly undermine the effectiveness of the congressionally designed remedy.

### D

Our conclusion that section 337 authorized the Commission's actions in this case is not inconsistent with court decisions that have accorded a narrow construction to the extraterritorial application of U.S. patent law, in particular *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007); *Amgen, Inc. v. U.S. International Trade Commission*, 902 F.2d 1532 (Fed. Cir. 1990); and *In re Amtorg Trading Corp.*, 75 F.2d 826 (CCPA 1935).  Those decisions focused on statutory provisions specific to patent law, especially the territorial limitations in the patent-granting clause.  The import of those decisions is that the Commission's broad and flexible authority to exclude from entry articles produced using "unfair methods of competition" cannot be used to circumvent express congressional limitations on the scope of substantive U.S. patent law.

---

[7]  TianRui does not argue that those duties were unenforceable for public policy reasons in any jurisdiction, and we do not presently address whether policy choices in a foreign jurisdiction can nullify a contractually imposed duty for the purposes of section 337.  *Cf.* 3 Roger M. Milgrim, *Milgrim on Trade Secrets* § 13.02[3] (2011) (explaining that such issues are usually resolved by the conflict rule of the forum); 1 Melvin F. Jager, *Trade Secrets Law* § 4:8 (2011) (describing different approaches to conflicts of law in trade secret actions).

Because there is no parallel federal civil statute regulating trade secret protection, there is no statutory basis for limiting the Commission's flexible authority under section 337(a)(1)(A) with respect to trade secret misappropriation.

In *Amtorg*, our predecessor court considered whether the Commission's authority to investigate "[u]nfair methods of competition and unfair acts in the importation of articles into the United States" authorized the Commission to enjoin imports of products made by a patented process. It did not, the court concluded, because section 337 did not enlarge the substantive scope of patent law. At the time, the protections of a United States patent were expressly limited to United States territories. 75 F.2d at 831, quoting 35 U.S.C. § 40 (1934). And the use or sale of a product made by a patented process did not constitute infringement of the process patent. *Id.* at 832. The court reasoned that the sale of products made abroad by a patented process must therefore be lawful unless "it was the purpose of Congress in enacting section 337 . . . to broaden the field of substantive patent rights, and create rights in process patents extending far beyond any point to which the courts have heretofore gone in construing the patent statutes." *Id.* at 834. After reviewing the legislative history, the court concluded that Congress did not intend to expand the scope of substantive patent law when it enacted section 337.

The court's analysis in *Amtorg* primarily addressed the scope of patent law and only secondarily considered the Commission's authority over "unfair methods of competition." To the extent *Amtorg* construed the scope of the Commission's jurisdiction over unfair methods of competition, Congress has subsequently rejected that construction in response to criticism by the Tariff Com-

mission. In its next annual report to Congress after *Amtorg* was decided, the Commission criticized the decision for holding that "the importation for use or sale of products made abroad by a process patented in the United States was not an unfair method of competition." U.S. Tariff Comm'n, *Nineteenth Annual Report* 12-13 (1936). In response to the Commission's report, Congress amended the law to declare that the importation of products made by a process patented in the United States "shall have the same status for the purposes of section [337]" as the importation of a patented product. 19 U.S.C. § 1337a (1940); *see* S. Rep. No. 76-1903, at 1-2 (1940); H. Rep. No. 76-1781, at 1-2 (1940). *Amtorg* thus has no effect on the scope of the Commission's authority to regulate trade secret misappropriation relating to the production of goods imported into this country.

*Amgen* and *Microsoft* are inapposite for similar reasons. In *Amgen*, the complainant asserted a product patent covering recombinant DNA and host cells against a different imported product, rEPO. 902 F.2d at 1534-35. Because the imported rEPO was produced abroad using the patented recombinant DNA and host cells, the complainant argued that the Commission had jurisdiction to bar its importation under 19 U.S.C. § 1337(a)(1)(B)(ii), the successor to section 1337a. We rejected that argument because section 1337(a)(1)(B)(ii) is limited to articles made abroad by a process patented in the United States, and the asserted patent covered products instead of processes. Because that decision did not address the Commission's section 337(a)(1)(A) jurisdiction over unfair practices, it is not relevant to the question in this case.

In *Microsoft*, the Supreme Court addressed the scope of an exception to "the general rule under United States patent law that no infringement occurs when a patented

product is made and sold in another country." 550 U.S. at 441. That exception, 35 U.S.C. § 271(f), allows infringement to be found when the "components" of a patented invention are supplied from the United States and combined abroad. The Court narrowly construed the term "component" to exclude the "intangible code" of an operating system because, inter alia, the presumption against extraterritorial application of United States law "applies with particular force in patent law." 550 U.S. at 454-55. Consequently, the Court held, the substantive patent right did not reach the sale of computers in foreign countries.

By contrast, as we have noted, the statutory prohibition on "unfair methods of competition and unfair acts in the importation of articles . . . into the United States" naturally contemplates that the unfair methods of competition and unfair acts leading to the prohibited importation will include conduct that takes place abroad. Because the statute applies to goods that are presented for importation, it would be a strained reading of the statute to bar the Commission from considering acts of trade secret misappropriation that occur abroad. In cases in which misappropriated trade secrets are used in the manufacture of the imported goods, the misappropriation will frequently occur overseas, where the imported goods are made. To bar the Commission from considering such acts because they occur outside the United States would thus be inconsistent with the congressional purpose of protecting domestic commerce from unfair methods of competition in importation such as trade secret misappropriation.

III

TianRui's second ground for appeal focuses on the requirement of section 337 that the acts of unfair competition threaten "to destroy or substantially injure an industry in the United States." 19 U.S.C. § 1337(a)(1)(A)(i). TianRui contends that in trade secret cases, the domestic industry must practice the misappropriated trade secret in order for the Commission to be authorized to grant relief. Because Amsted has no domestic operations practicing the misappropriated ABC process, TianRui argues that its imported wheels cannot be held to injure or threaten injury to any domestic industry within the meaning of section 337.

Section 337 contains different requirements for statutory intellectual property (such as patents, copyrights, and registered trademarks) than for other, nonstatutory unfair practices in importation (such as trade secret misappropriation). The provisions that apply to statutory intellectual property require that an industry relating to the protected articles exists or is in the process of being established. 19 U.S.C. § 1337(a)(2). Such an industry will be deemed to exist if there is significant domestic investment or employment relating to the protected articles. *Id.* § 1337(a)(3). In contrast, the general provision relating to unfair practices is not satisfied by evidence showing only that a domestic industry exists; it requires that the unfair practices threaten to "destroy or substantially injure" a domestic industry. *Id.* § 1337(a)(1)(A). On the other hand, there is no express requirement in the general provision that the domestic industry relate to the intellectual property involved in the investigation. Notwithstanding that textual distinction, TianRui contends that investigations involving intellectual property under the unfair practices provision require

the existence of a domestic industry that relates to the asserted intellectual property in the same manner that is required for statutory intellectual property.

In support of its argument, TianRui cites the legislative history of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1212, which created the separate requirements for statutory intellectual property. Before that Act, section 337 of the Tariff Act of 1930 set forth the same requirements for all unfair practices in import trade, including the injury requirement. *See* 19 U.S.C. § 1337(a) (1982). The 1988 Act removed the injury requirement for statutory intellectual property and instead simply required evidence that "an industry in the United States, relating to the articles protected by the [statutory intellectual property], exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). The Senate report noted that "[a]lthough the injury test has been eliminated for certain intellectual property rights cases, a complainant must still establish that a U.S. industry relating to the articles or intellectual property right concerned 'exists or is in the process of being established.'" S. Rep. No. 100-71, at 129 (1987). According to TianRui, that legislative history demonstrates that Congress removed the injury requirement only for statutory intellectual property, but retained the requirement that a domestic industry exists that relates to the asserted rights for *all* intellectual property, including trade secrets.

We disagree with TianRui's interpretation of the legislative history. Congress recognized that prior to the 1988 Act section 337 did not define "industry." H.R. Rep. No. 100-576, at 634 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1667. Both the Senate and the House of Representatives agreed that an "industry" would exist

for intellectual property investigations if there was significant domestic investment or employment relating to the articles protected by the intellectual property. *Id.*; *see also* 19 U.S.C. § 1337(a)(3). They disagreed, however, as to whether that definition should apply to common law trademarks and trade secrets. H.R. Rep. No. 100-576, at 634; S. Rep. No. 100-71, at 347. The Senate proposed that the definition apply to common law trademarks and trade secrets, and the language from the Senate report cited by TianRui is consistent with that proposal. But the Senate receded from its proposal after conference, and the new definition of "industry" was limited to statutory intellectual property. Because the Senate's proposal did not become law, we cannot rely on the legislative history discussing that proposal to read a strict definition of "industry" into section 337(a)(1)(A), when the statute itself contains no such definition.

TianRui next contends that its construction is required by the reenactment doctrine. TianRui argues that the Commission had a longstanding interpretation that defined "industry" for trade secret investigations as the portion of "complainant's domestic operations devoted to utilization of the confidential and proprietary technology at issue" in the investigation. *See Sausage Casings*, USITC Pub. 1624, at 341 (Initial Determination). Because Congress substantially reenacted the Commission's jurisdiction over unfair practices without disapproving of that interpretation, according to TianRui, Congress effectively adopted the Commission's interpretation.

The Commission disagrees with TianRui's characterization of its prior decisions. The Commission contends that it has applied that definition in some trade secret investigations, but that in other investigations it has relied on a more flexible "realities of the marketplace"

test.  We have reviewed the investigations cited by the parties and conclude that there was not a consistent interpretation, as TianRui contends.  *See, e.g., Copper Rod*, USITC Pub. 1017, at 53-55, 58 (Commission Memorandum Opinion) (rejecting a narrow definition of "domestic industry" based on intellectual property and instead looking to the "realities of the marketplace"); *see also Certain Floppy Disk Drives and Components*, Inv. No. 337-TA-203, USITC Pub. No. 1756, at 44-45 (Initial Determination) (Sept. 1985) ("The Commission does not adhere to any rigid formula in determining the scope of the domestic industry as it is not precisely defined in the statute, but will examine each case in light of the realities of the marketplace.").  TianRui's argument based on the reenactment doctrine therefore falls with its premise.

In sum, we conclude that the Commission did not err in defining the domestic industry in this case.  The parties submitted evidence indicating that the imported TianRui wheels could directly compete with wheels domestically produced by the trade secret owner.  That type of competition, the Commission concluded, is sufficiently related to the investigation to constitute an injury to an "industry" within the meaning of section 337(a)(1)(A).  We hold that the Commission's conclusion in that regard is based on a proper construction of the statute and that its factual analysis of the effect of TianRui's imports on the domestic industry is supported by substantial evidence.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**TIANRUI GROUP COMPANY LIMITED AND TIANRUI GROUP FOUNDRY COMPANY LIMITED,**
*Appellants,*

**and**

**STANDARD CAR TRUCK COMPANY, INC. AND BARBER TIANRUI RAILWAY SUPPLY, LLC,**
*Appellants,*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

**and**

**AMSTED INDUSTRIES INCORPORATED,**
*Intervenor.*

---

2010-1395

---

On appeal from the United States International Trade Commission in Investigation No. 337-TA-655.

---

MOORE, *Circuit Judge*, dissenting.

The majority in this case expands the reach of both 19 U.S.C. § 1337 (§ 337) and trade secret law to punish TianRui Group Company Limited (TianRui) for its completely extraterritorial activities. As a court, however, we

must act within the confines set out by the text of the law. Here, there is no basis for the extraterritorial application of our laws to punish TianRui's bad acts in China. As a result, I respectfully dissent.

The majority in this case holds that 19 U.S.C. § 1337(a)(1)(A), which applies to "unfair acts in the importation of articles . . . into the United States," allows the International Trade Commission (Commission) to bar imports because of acts of unfair competition occurring entirely *in China*. The majority states the issue: "The main issue in this case is whether § 337 authorizes the Commission to apply domestic trade secret law to conduct that occurs in part in a foreign country." Maj. Op. at 7. With all due respect, that is not the issue. The issue is whether § 337 authorizes the Commission to apply domestic trade secret laws to conduct which *entirely* occurs in a foreign country.

The facts of this case are not disputed. A Chinese company, Datong, had a license from a United States company, Amsted, to use in China a process which Amsted kept secret. TianRui, the Chinese company accused of violating § 337 in this case, hired several employees from its Chinese competitor, Datong. These employees disclosed the trade secrets to TianRui *in China* who used them *in China* to make railway wheels *in China*. The acts which arguably constitute misappropriation (theft of a trade secret) all occurred in China.[1]

---

[1]     Amsted does argue that some of TianRui's acts, such as TianRui's marketing and certification efforts, constitute misappropriation of the trade secret in the United States. The majority, however, explicitly rejected these arguments: "we reject Amsted's argument that TianRui's marketing and certification efforts in this country qualified as acts of 'use' of Amsted's trade secrets (and thus constituted acts of misappropriation). That

To be clear, I agree that trade secret misappropriation falls squarely within the terms of § 337: if TianRui carried out its acts of misappropriation in the United States – namely if TianRui came to the United States and stole Amsted's trade secrets here – then § 337 could be used to bar import of any goods made with the stolen technology. But, as the majority concedes, these are not the facts of this case, and to the extent there was a misappropriation of any Amsted trade secret that misappropriation occurred abroad. Maj. Op. at 11 n.1. In this case, *none* of the acts which constitute misappropriation occurred in the United States. While TianRui is certainly not a sympathetic litigant – it poached employees to obtain confidential information – none of the unfair acts occurred in the United States and, as such, there is no violation of United States law which amounts to an unfair trade practice under the statute.

United States trade secret law simply does not extend to acts occurring entirely in China. We have no right to police Chinese business practices. Under the majority's rule today, if the United States government should decide that goods were being produced in a foreign country using what we consider to be unfair business practices, § 337 allows for their exclusion from the United States. The potential breadth of this holding is staggering. Suppose that goods were produced by workers who operate under conditions which would not meet with United States labor laws or workers who were not paid minimum wage or not paid at all – certainly United States industry would be hurt by the importation of goods which can be manufactured at a fraction of the cost abroad because of cheaper

---

conduct may have exploited the earlier misappropriation but it cannot reasonably be viewed as misappropriative conduct without a breach of a duty of confidentiality." Maj. Op. at 11 n.1.

or forced labor. Would we consider these business practices unfair? Absent clear intent by Congress to apply the law in an extraterritorial manner, I simply do not believe that we have the right to determine what business practices, conducted entirely abroad, are unfair. According to the majority, its interpretation of § 337 does not give the Commission "the authority 'to police Chinese business practices'", "[i]t only sets the conditions under which products may be imported into the United States." Maj. Op. at 15. This holding could not be clearer – the Commission cannot police Chinese business practice *unless* the Chinese wish to import the goods into the United States. The act of importation opens the door to scrutiny of all business practices of the importer associated with the goods including those conducted entirely within China. Section 337 simply does not authorize this level of scrutiny of entirely foreign acts.

## I.

Section 337 provides that "[u]nfair methods of competition and unfair acts in the importation of articles . . . into the United States" which substantially injure a domestic industry are unlawful. 19 U.S.C. § 1337(a)(1)(A). The unfair act alleged to violate the statute is not the importation of the wheels into the United States. There is nothing inherently unfair about the wheels or the process by which they are imported in this case. Nor is the presence of the wheels in the United States somehow itself an unlawful act – a stark contrast to the illegal immigration cases relied on by the majority where the mere presence of the person in the United States *is* the unlawful act. The unfair act in this case is the alleged trade secret misappropriation. And both the majority and dissent agree that the conduct related to the misappropriation occurred entirely in China. Any "unfair act" in this case is wholly extraterritorial.

The question is thus whether § 337 contains a clear indication of congressional intent to extend its reach to wholly extraterritorial unfair acts. Analysis of § 337 must be carried out in view of the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (*Aramco*) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). "Unless there is the affirmative intention of Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions." *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) (internal quotations omitted). When applying this principle, "we look to see whether 'language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control.'" *Id.* (alteration in original) (quoting *Foley Bros.*, 336 U.S. at 285).

I see nothing in the plain language of the statute that indicates that Congress intended it to apply to unfair acts performed entirely abroad. The majority points to no statutory language that expresses the *clear* intent for it to apply to extraterritorial unfair acts. As a result, this is a simple case: without any indication of a congressional intent to extend § 337's coverage beyond places over which the United States has sovereignty or has some measure of legislative control, we must limit the reach of the statute to unfair acts in the United States. *Cf. id.* When the statute is silent as to extraterritorial application, the law is clear: "it has none." *Id.* at 2878. Indeed, based on this presumption the Supreme Court has rejected extraterritorial scope for a number of statutes with

much stronger textual support than § 337. *See, e.g.,* *Small v. United States*, 544 U.S. 385, 394 (2005) ("Given the reasons for disfavoring an inference of extraterritorial coverage from a statute's total silence and our initial assumption against such coverage . . . we conclude that the phrase 'convicted in any court' refers only to domestic courts, not to foreign courts."); *Morrison,* 130 S. Ct. at 2882 (Even broad references to commerce that expressly reference foreign commerce do "not defeat the presumption against extraterritoriality.").

The majority claims that importation "is an inherently international transaction," and analogizes imports to illegal immigrants, false statements during entry into the United States, the failure to pay an excise tax, and the Economic Espionage Act. Maj. Op. at 13, 16 n.4. In each of those circumstances, however, the courts were confronted either with express statutory language indicating their extraterritorial application, *see, e.g.,* *Pasquantino v. United States*, 544 U.S. 349, 371-72 (2004) ("the wire fraud statute punishes frauds executed 'in interstate or *foreign* commerce'" (emphasis added)); Economic Espionage Act, 18 U.S.C. § 1837 (explicitly stating it "also applies to conduct occurring outside the United States"); *United States v. Villanueva*, 408 F.3d 193, 198 (5th Cir. 2005) (explaining that Congress amended the immigration statute to overturn an Eleventh Circuit case which held that the statute did not apply to extraterritorial acts),[2] or the Court held their was no extraterritorial

---

[2] The court held that amending the statute "strongly suggests that Congress intended extraterritorial application." *Villanueva*, 408 F.3d at 198. Moreover, the illegal immigration cases present a completely different issue than § 337: an illegal alien's presence in the United States is, by definition, the prohibited act. In contrast, there is nothing illegal about having TianRui's wheels in the United States and nothing unfair about TianRui's acts

application of the statute at issue, *see, e.g.*, *Small*, 544 U.S. 385.

The proper focus to determine whether there is "an affirmative intention of Congress clearly expressed" is the language of the statute. Section 337 limits the unfair acts to "unfair acts *in* the importation of articles" into the United States. The majority reads this limitation out of the statute, and claims that Congress "clearly intended to create a remedy for the importation of goods *resulting from* unfair methods of competition," Maj. Op. at 16.

Our predecessor court rejected essentially the same argument nearly eighty years ago, and held that § 337 could not be used to exclude from importation goods produced by a process patented in the United States but carried out abroad. *In re Amtorg Trading Corp.*, 75 F.2d 826, 834 (CCPA 1935). In *Amtorg*, foreign mining companies used processes disclosed and claimed in United States patents abroad, and then shipped the resulting products into the United States. *Id.* at 831. Even though it would be unfair to use the patented process to produce the same goods within the United States, we explained that this was not an unfair act in the importation of articles since § 337 did not expressly include the authority to apply our laws to acts carried out abroad. *Id.* at 831-32. In other words, because importing the product into the United States offended no domestic laws,[3] it was not an unfair act in importation and therefore could not be excluded under § 337. Since there is nothing unfair about the *importation* of the wheels in this case (the appropriate inquiry under § 337) as opposed to their *manufacture*

in importing them. The only allegedly unfair act was their manufacture, which occurred entirely in China and is beyond the reach of our domestic trade secret laws.

[3] At the time of *Amtorg*, 35 U.S.C. § 271(g) did not exist.

abroad (which is outside the scope of the plain language of the statute), like *Amtorg* we must conclude that the wholly extraterritorial trade secret misappropriation is not an unfair act in importation.[4]

After *Amtorg*, Congress passed an amendment, codified at 19 U.S.C. § 1337a (1940), which allowed the Commission to prevent the "importation . . . of a product made . . . by means of a process covered by the claims of any unexpired valid United States letters patent." Section 1337a – unlike § 337 – is a clear indication of Congressional intent that the extraterritorial use of processes claimed in United States patents fall within the scope of unfair acts. *See* H.R. Rep. No. 1781, 76th Cong., 3d Sess. 4 (1940) ("Since the *Amtorg* decision owners of American process patent [sic] are helpless to prevent the infringement abroad of their patent rights. This bill will give to them the same rights which the owners of product patents have."). We must be mindful of the Supreme Court's clear guidance regarding the limits of extraterritoriality: "when a statute provides for some extraterritorial application,

---

[4] The majority sidesteps this problematic issue by declaring that trade secret misappropriation is different from *Amtorg* and other cases dealing with patents, which consistently hold that § 337 cannot be applied extraterritorially. The majority argues that "[t]hose decisions focused on statutory provisions specific to patent law, especially the territorial limitations in the patent granting clause." Maj. Op. at 22. The focus on the express territoriality of our patent laws, however, turns the default rule against extraterritoriality on its head: unless a statute gives a "clear indication of an extraterritorial application, *it has none.*" *Morrison*, 130 S. Ct. at 2878 (emphasis added). Even if our patent laws had no territorial limitations, it would not change the outcome of *Amtorg* or any of our other cases involving § 337. Moreover, our trade secret laws are no less territorial than our patent laws.

the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison*, 130 S. Ct. at 2883. Congress could have legislated generally to grant extraterritorial application to any "unfair acts" in § 337, but did not. Congress *only* changed the statute to create a remedy for extraterritorial use of process patents.[5] This delicate legislative touch indicates that Congress intended to give special treatment solely to process patents, and not to other categories of "[u]nfair methods of competition and unfair acts in the importation of articles."

The majority also suggests that the legislative history demonstrates that § 337 should be applied to extraterritorial instances of trade secret misappropriation. Maj. Op. 17-19. The legislative history, like the plain language of the statute, lacks a *clear* indication that Congress intended § 337 to apply extraterritorially. The legislative history indicates that Congress intended to give the Tariff Commission (later the International Trade Commission) power to exclude goods when there was an unfair act in importation. For example, it would be unfair for "individuals residing outside the jurisdiction of the United States" to engage in "unfair price cutting, full line forcing, [or] commercial bribery" when importing their products into the United States. U.S. Tariff Comm's, *Sixth Annual Report* 4 (1922). Nothing in the cited legislative history suggests that Congress intended to give the Commission the power to punish individuals for bad acts taking place entirely outside of the United States.

The majority's entire analysis hinges on a single sentence from the U.S. Tariff Commission's *Sixth Annual*

---

[5] We previously recognized both the limited scope of § 337 and the narrow extraterritorial authorization of the process patent exception enacted in § 1337a. *Amgen, Inc. v. U.S. Int'l Trade Comm'n*, 902 F.2d 1532, 1537-40 (Fed. Cir. 1990).

*Report* 4 (1922):[6]  "These provisions make it possible for the President to prevent unfair practices, even when engaged in by individuals residing outside the jurisdiction of the United States."  There are several problems with the majority's conclusion.  First, this sentence is not even legislative history – the statement was made after the enactment of § 316, a predecessor to § 337.  The statement was not made in a Senate Report or House Report or even during any hearing before Congress.  It is made in a 99 page annual report that the Tariff Commission sent to Congress as part of its annual reporting requirements.  The majority says that this sentence becomes legislative history because Congress did not "disagree with the Commission's characterization" eight years later when § 316 became § 337 (in the Tariff Act of 1930).  Maj. Op. at 18-19.  Even if this sentence was clear on its face, I cannot conclude that this sentence in this report is sufficient to overcome the presumption against extraterritorial application of the statute.

Second, contrary to the majority's suggestion, the reference to "individuals residing outside the jurisdiction of the United States" in this sentence is not even related to the scope of the acts contemplated.  Our predecessor court explained that § 337 was necessary because:

> manufactured products, produced in a foreign country where the producer is beyond the control of the courts of the United States, are imported into this country.  Up until the time when they are released from customs custody into the com-

---

[6]  The majority cites other sentences that indicate that § 337's predecessor (§ 316), would "broadly" prevent unfair competition – but saying it is broad is not the same thing as saying it applies extraterritorially.  The statute does broadly cover everything from acts of bribery to false labeling to price fixing to patent infringement.

merce of this country, no opportunity is presented to the manufacturer of the United States to protect himself against unfair methods of competition or unfair acts. After the goods have been so released into the commerce of the country, the American manufacturer may assert his rights against any one who has possession of, or sells, the goods. However, this method of control must be, and is, ineffective, because of the multiplicity of suits which must necessarily be instituted to enforce the rights of the domestic manufacturer. This phase of the matter obviously was in the minds of the Congress at the time of the preparation of said section 337.

*In re Orion Co.*, 71 F.2d 458, 466-67 (CCPA 1934). Thus, § 337 was enacted to solve the problem faced by domestic industry when individuals outside the United States imported products which, upon release into the domestic stream of commerce, gave rise to a domestic cause of action. Section 337 provided a means to prevent the unfair act at its source, during the act of importation, thereby avoiding an impossible multiplicity of suits. *See id.* at 467 ("'The owner of a patent, seeking to protect himself, is confronted with the necessity of proceeding against individual wholesalers or retailers. The resulting multiplicity of suits imposes an impossible burden. Stoppage of importation of infringing articles through an order of exclusion from entry is the only effectual remedy.'"). Hence, it is not clear that the single sentence cited by the majority even stands for the proposition that the Commission believed § 316 applied to entirely extraterritorial

acts.[7]  It certainly does not present clear evidence that *Congress* did.

In sum, there is no indication in § 337 that Congress intended it to apply to wholly extraterritorial unfair acts. In light of the plain language of the statute, the legislative history, the selective Congressional action to grant extraterritorial effect to process patents, and the contrast to other extraterritorial statutes, I conclude § 337 does not reach the misappropriation and use of trade secrets in China, even if the product of the misappropriated process is ultimately imported into the United States.

## II.

The problem underlying the majority's analysis is that "[f]oreign conduct is generally the domain of foreign law." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) (internal quotations omitted).[8]  I sympathize with Amsted

---

[7]  The majority claims the single ambiguous sentence from 1922 and the Commission case *Certain Processes for the Manufacture of Skinless Sausage Casings and Resulting Product*, Inv. No. 337-TA-148/169, USITC Pub. 1624 (Dec. 1984) (*Sausage Casings*) means that the Commission has construed § 337 to reach misappropriation that occurs entirely abroad, and suggests that this interpretation should be given deference.  Maj. Op. at 20.  The issue of extraterritoriality, however, was neither raised by the parties nor analyzed by the commission in *Sausage Casings*, which focused on whether the producer independently developed its process.  There is no reasonable statutory interpretation deserving deference in *Sausage Casing*.

[8]  The majority claims there is no conflict between trade secret laws in the United States and China, and concludes that the absence of conflict supports granting "relief based on extraterritorial acts of trade secret misappropriation relating to the importation of goods affecting a domestic industry."  Maj. Op. at 21.  This conclusion, however, conflicts with the Supreme Court's explanation

and, if the bad acts were carried out in the United States, would not hesitate to find for Amsted. My sympathy, however, is somewhat muted since Amsted had a ready-made solution to its problem: obtain a process patent. The statute is clear that the extraterritorial acts in this case are subject to § 337 if the process is protected by a patent. In the alternative, Amsted could have also protected its intellectual property by keeping the various processes completely secret. Instead, Amsted chose to deny the public full knowledge of its innovation while simultaneously exploiting the trade secret by licensing it to a Chinese corporation for use in China.

By broadening the scope of trade secret misappropriation to the extraterritorial actions in this case, the majority gives additional incentive to inventors to keep their innovation secret. Of course, this also denies society the benefits of disclosure stemming from the patent system, which are anathema to trade secrets. Moreover, while Amsted (or more likely its Chinese licensee) will benefit from this decision, the burden of preserving Amsted's trade secret now falls squarely on the American consumer who misses out on the opportunity for increased competition and concomitant lower prices offered by TianRui's products.

---

that "[t]he canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law." *Morrison*, 130 S. Ct. at 2878. The issue here is the Commission's authority to punish TianRui, whose acts in the importation of its wheels give rise to no cause of action, based on wholly extraterritorial acts carried out in China. Even if Chinese trade secret laws were identical to our laws, this does not give the Commission the power to interpret and apply Chinese laws to TianRui's unfair acts in China. If there has been some violation of Chinese law, any remedy must come from Chinese courts.

I understand a restrictive approach to extraterritoriality is not immediately popular in this case. We must, however, work within the confines of the statute and the clear presumption against extraterritoriality. It is not our role to decide what the law should be but to apply it as we find it.